UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                          :

ALAN LAUFER,                          :
                                            :

                    Plaintiff,         :
                                            :    Case No. 16-CV-8487 (JPO) (DF)
         -against-               :
                                            :
                                            :
PRYOR CASHMAN LLP,            :
                                            :
                    Defendant.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

 

                                            VLADECK, RASKIN & CLARK, P.C.
                                            Attorneys for Plaintiff
                                            565 Fifth Avenue, 9th Floor
                                            New York, New York  10017
                                            (212) 403-7300

Of Counsel:
        Anne C. Vladeck
        Valdi Licul
        Joshua Tarrant-Windt

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

FACTS ......................................................................................................................................... 1

ARGUMENT ............................................................................................................................... 8

  I.   THE SUMMARY JUDGMENT STANDARD .............................................................. 8

  II.  AGE DISCRIMINATION ............................................................................................... 9

      A.      Replacement by Younger Co-Worker ................................................................. 11

      B.      Discriminatory Comments .................................................................................. 12

      C.      Pretext ................................................................................................................. 15

      D.      Comparative Evidence ........................................................................................ 20

CONCLUSION .......................................................................................................................... 24

## TABLE OF AUTHORITIES

Page(s)

**Cases**

Abdu-Brisson v. Delta Air Lines, Inc.,
    239 F.3d 456 (2d Cir. 2001)................................................................................15

Back v. Hastings on Hudson Union Free Sch. Dist.,
    365 F.3d 107 (2d Cir. 2004)..............................................................................8, 10

Benedith v. Malverne Union Free Sch. Dist.,
    38 F. Supp. 3d 286 (E.D.N.Y. 2014) ...................................................................24

Bennett v. Health Mgmt. Sys., Inc.,
    936 N.Y.S.2d 112 (N.Y. App. Div. 2011) .........................................10, 15, 17, 20

Brown v. Crowdtwist,
    No. 12cv6110 (HB), 2014 WL 1468145 (S.D.N.Y. Apr. 15, 2014)......................15

Buckley v. The National Football League,
    No. 18-cv-03309 (S.D.N.Y. Apr. 16, 2018) ........................................................20

Carlton v. Mystic Transp., Inc.,
    202 F.3d 129 (2d Cir. 2000)...........................................................................11, 23

Chertkova v. Conn. Gen. Life Ins. Co.,
    92 F.3d 81 (2d Cir. 1996)...............................................................................11, 16

Colandrea v. Hunter-Tannersville Cent. Sch. Dist.,
    No. 1:15 Civ. 0456 (LEK)(ATB), 2017 WL 1082439 (N.D.N.Y. Mar. 22,
    2017) ....................................................................................................................11

In re Dana Corp.,
    574 F.3d 129 (2d Cir. 2009)..................................................................................9

Danzer v. Norden Sys., Inc.,
    151 F.3d 50 (2d Cir. 1998).........................................................................9, 14, 23

Dayton v. Modesto Irrigation Dist.,
    No. CV-F-06-1070 (LJO), 20078 WL 4107904 (E.D. Cal. Nov. 16, 2007)...........13

Delville v. Firmenich Inc.,
    920 F. Supp. 2d 446 (S.D.N.Y. 2013).....................................................8, 14, 15, 23

DeMarco v. Holy Cross High Sch.,
    4 F.3d 166 (2d Cir. 1993)..................................................................................................18

Dupree v. UHAB-Sterling St. Hous. Dev. Fund Corp.,
    No. 10-CV-1894, 2012 WL 3288234 (E.D.N.Y. Aug. 10, 2012) ..........................................16

Feingold v. New York,
    366 F.3d 138 (2d Cir. 2004)................................................................................................23

Goodwine v. City of New York,
    No. 15-CV-2868 (JMF), 2016 WL 3017398 (S.D.N.Y. May 23, 2016) ................................20

Gorzynski v. JetBlue Airways Corp.,
    596 F.3d 93 (2d Cir. 2010)....................................................................................9, 22, 24

Graham v Long Island R.R.,
    230 F.3d 34 (2d Cir 2000)..................................................................................................22

Gross v. FBL Fin. Servs., Inc.,
    557 U.S. 167 (2009)...........................................................................................................10

Gupta v. Al Jazeera Am., LLC,
    No. 16-CV-2980 (VEC), 2018 WL 1605571 (S.D.N.Y. Mar. 29, 2018) ........................18, 19

Hazen Paper Co. v. Biggins,
    507 US 604 (1993).............................................................................................................12

Herbert v. Nat'l Amusement, Inc.,
    833 F. Supp. 2d 192 (D. Conn. 2011) ...............................................................................13

Hird-Moorhouse v. Belgian Mission to U.N.,
    No. 03 Civ. 9688, 2010 WL 3910742 (S.D.N.Y. Oct. 5, 2010) ........................................14

Holtz v. Rockefeller & Co., Inc.,
    258 F.3d 62 (2d Cir. 2001).................................................................................................15

Irizarry v. United Parcel Serv., Inc.,
    No. 3:11 Civ. 01658 (JCH), 2014 WL 1246684 (D. Conn. Mar. 24, 2014) ......................11

Kirkland v. Cablevision Sys.,
    760 F.3d 223 (2d Cir. 2014)...............................................................................................15

Kirsch v. Fleet St., Ltd.,
    148 F.3d 149 (2d Cir.1998).................................................................................................14

Knutson v. Brounstein,
    No. 99 CIV. 6094, 2001 WL 1661929 (S.D.N.Y. Dec. 27, 2001)......................................14

Machinchick v. PB Power, Inc.,
  398 F.3d 345 (5th Cir. 2005) ...................................................................................13

Mack v. United States,
  814 F.2d 120 (2d Cir. 1987)....................................................................................19

McGuinness v Lincoln Hall,
  263 F3d 49 (2d Cir 2001)........................................................................................22

Memnon v. Clifford Chance US, LLP,
  667 F.Supp.2d 334 (S.D.N.Y. 2009).......................................................................24

Mihalik v. Credit Agricole Cheuvreux, N.A., Inc.,
  715 F.3d 102 (2d Cir. 2013)....................................................................................10

O'Connor v. Consol. Coin Caterers Corp.,
  517 U.S. 308 (1996)................................................................................................23

O'Reilly v. Marina Dodge, Inc.,
  435 F. App'x 8 (2d Cir. 2011).................................................................................12

Patrick v. LeFevre,
  745 F.2d 153 (2d Cir. 1984).....................................................................................9

Peterson v. Mid-State Grp., Inc.,
  54 F. Supp. 3d 1039 (E.D. Wis. 2014).....................................................................13

Redd v. N.Y. Div. of Parole,
  678 F.3d 166 (2d Cir. 2012)......................................................................................8

Reeves v. Sanderson Plumbing Prod., Inc.,
  530 U.S. 133 (2000)............................................................................................9, 17

Rivera v. Rochester Genesee Reg'l Transp. Auth.,
  743 F.3d 11 (2d Cir. 2014)........................................................................................9

Rodriguez v. Vill. Green Realty, Inc.,
  788 F.3d 31 (2d Cir. 2015)........................................................................................9

Rollins v. Fencers Club, Inc.,
  128 A.D.3d 401 (N.Y. App. Div. 2015) .................................................................23

Shah v. James P. Purcell Assocs., Inc.,
  No. 3:05CV00306(PCD), 2007 WL 1630311 (D. Conn. Jun. 4, 2007)...................14

Sheridan v. E.I. DuPont de Nemours & Co.,
  100 F.3d 1061 (3d Cir. 1996)..................................................................................17

Stratton v. Dep't for the Aging for the City of N.Y.,
    132 F.3d 869 (2d Cir. 1997)...........................................................................................15

Taggart v. Time, Inc.,
    924 F.2d 43 (2d Cir. 1991).............................................................................................21

Thomas v. iStar Fin., Inc.,
    438 F. Supp. 2d 348 (S.D.N.Y. 2006)...........................................................................23

Tolbert v. Smith,
    790 F.3d 427 (2d Cir. 2015)...........................................................................................12

Tomassi v. Insignia Fin. Grp., Inc.,
    478 F.3d 111 (2d Cir. 2007)...............................................................................12, 13, 14

Walsh v. New York City Housing Auth.,
    828 F.3d 70 (2d Cir. 2016).........................................................................................9, 11

Wanamaker v. Columbian Rope Co.,
    108 F.3d 462 (2d Cir. 1997)...........................................................................................10

Weinstock v. Columbia Univ.,
    No. 95 Civ. 0569 (JFK), 1996 WL 658437 (S.D.N.Y. Nov. 13, 1996)...................................20

White v. ABCO Eng'g Corp.,
    221 F.3d 293 (2d Cir. 2000).............................................................................................8

Winitt v. N.Y. State Div. of Human Rights,
    377 N.Y.S.2d 60 (N.Y. App. Div. 1975) ........................................................................13

Zann Kwan v. Andalex Group LLC,
    737 F.3d 834 (2d Cir. 2013)......................................................................................10, 15

Zimmerman v. Assocs. First Capital Corp.,
    251 F.3d 376 (2d Cir. 2001)...........................................................................................19

**Statutes**

29 U.S.C. § 623(a) ........................................................................................................9

N.Y.C. Admin. Code § 8-107 ........................................................................................9

## PRELIMINARY STATEMENT

Ronald Shechtman, Pryor Cashman's Managing Partner, wanted younger attorneys. He boasted that the partnership had grown "steadily younger" and believed that the Firm needed to add "younger people" in order to survive. Plaintiff Alan Laufer did not fit into those plans. He was a steady and efficient lawyer who generated more revenue than virtually all of his fellow associates and was able to litigate complex matters with little, or no, supervision. Unfortunately for Laufer, he was also the Firm's oldest associate and, after more than 17 years at the Firm, was pushing 60 years old. As a result, Pryor branded Laufer as "stubborn," "inflexible" and "curmudgeonly," insults typically lobbed at older workers. Ultimately, Pryor fired Laufer after finding a substantially younger, but less-qualified, replacement. To cover its tracks, Pryor created false and misleading reasons for doing so, including falsifying Laufer's personnel file. Pryor's actions violated federal and local laws that prohibit age discrimination.

## FACTS

### Background

Laufer is a highly qualified and experienced attorney who has practiced extensively in the field of trusts and estates. He earned a law degree from Syracuse University College of Law and an LLM in Taxation from New York University. (Plaintiff's Response to Defendant's Local Civil Rule Pl. 56.1 Statement of Material Facts on Motion for Summary Judgment and Plaintiff's Counterstatement of Disputed Facts ("Pl. 56.1") ¶¶ 133-34) He also has accounting experience, having earned an M.S. in Accounting from Syracuse University College of Business Administration and been a Certified Public Accountant since 1980. (Id. ¶ 135) From 1978 to 1997, Laufer worked for various law firms, mainly performing legal services related to tax law and trusts and estates. (Id. ¶ 136) He also performed legal and accounting services as a sole practitioner from 1992 to 1997, before joining Pryor. (Id. ¶ 137)

<u>Laufer's Work at Pryor</u>

Laufer joined Pryor as a contract attorney in August 1997, where he worked in the Firm's Trusts and Estates Group.  (<u>Id.</u> ¶ 139)  Within eight months, Laufer earned a promotion to permanent associate.  Richard Kay, the Co-head of the Trusts & Estates practice, hired and supervised Laufer.  (<u>Id.</u> ¶¶ 21, 139-40) Within the Trusts and Estates Group, Laufer worked on complex wills, trusts agreements and other estate planning documents and also represented clients in connection with complex issues involving the organization and administration of charitable organizations, including public charities, private foundations, charitable lead trusts and charitable remainder trusts. (<u>Id.</u> ¶ 141)

Moreover, Laufer also worked on litigated matters including will contests, disputed administration and accountings and actions against fiduciaries.  (<u>Id.</u> ¶ 142) Laufer often worked on these litigated matters with little or no supervision, often acting as sole lead counsel at depositions.  (<u>Id.</u>)  Through his work on over a dozen such matters, he successfully engaged in motion practice and deposed witnesses.  (<u>Id.</u> ¶ 146)

Laufer was trusted to review the work of a partner and perform legal work for the family members of partners.  (<u>Id.</u> ¶¶ 143, 147)  For matters that Laufer originated, he was responsible for virtually all of the work he performed for those clients, including all client contact, with little to no involvement from Kay.  (<u>Id.</u> ¶ 145)

<u>Laufer's Originations</u>

Laufer also brought business to the firm, originating a number of matters that resulted in significant fees to Pryor.  (<u>Id.</u> ¶¶ 146, 148-49)  For the period 2013 to 2015, Laufer significantly outperformed almost all of Pryor's associates in terms of bringing in revenue.  During this period, only 23 of Pryor's more than 60 associates brought in any originations and among the 23, Laufer

was fifth highest.  (Id. ¶ 151)  Laufer's origination in the years preceding 2013 were comparable and perhaps higher.  For example, in or about 2010 or 2011, Laufer brought in approximately $190,000, including one receivable of over $133,000. (Id. ¶ 152)  In or about 2002, one of Laufer's clients generated about $250,000 in fees over the next several years. (Id. ¶ 153)  By comparison, the most revenue any Pryor associate generated in any single year from 2013 to 2015 was less than $65,000.  (Id. ¶ 154)

Laufer brought in business even though associates are not expected to bring in business and it is unusual for an associate to bring in an origination amount of $100,000 or more. (Id. ¶ 155) Shechtman admitted that if another associate had brought in this amount of revenue he would have reached out to the associate's department head, found out what the associate was doing and what the department head thought of the associate's business development.  (Id. ¶ 156)  However, Shechtman did not do anything with respect to Laufer's significant originations.  (Id. ¶ 158)[1]

### Pryor's Treatment of Laufer

Pryor consistently treated Laufer worse than younger associates.  For example, Pryor assigned each associate a class year tied to his year of graduation, which, in turn, determined the associate's compensation.  (Id. ¶ 161) Pryor adjusted the associate's class year depending on the nature of the associate's experience since graduation so that an associate with training that was "not commensurate" with his year of graduation would be placed in a "lower class." (Id. ¶¶ 162-63) At the time of his hire, Laufer had 19 years of experience that was directly related to his work as an associate at Pryor. (Id. ¶ 164) Nevertheless, Pryor disregarded Laufer's experience and year

---

[1] Laufer's efforts continued to bring in revenue for Pryor even after Laufer was dismissed.  For instance, one matter that Laufer originated generated approximately $65,000 for Pryor in 2016. (Pl. 56.1 ¶ 158) By contrast, after Laufer's departure, associates in the tax department supervised by Eric Woldenberg, Laufer's other supervisor, generated "minor" originations that were only "[a] couple of thousand dollars." (Id. ¶ 159)

of graduation, determined that Laufer did not fit into its class structure, and paid him a relatively low salary base.  (Id. ¶ 165) In addition, Pryor usually conducted annual performance reviews of associates, which typically involved the associate's supervising partner and other appropriate partners. (Id. ¶ 166) Laufer, however, never received a performance review.  (Id. ¶ 167)

In 2007, Shechtman became Pryor's Managing Partner.  (Id. ¶ 168) Shechtman was also the head of the Firm's Executive Committee and Associate Compensation Committee. (Id. ¶ 169) Shechtman's stated goal was to promote younger attorneys.  (Id. ¶ 171) He boasted that "[o]ver the years, [Pryor] ha[d] consistently populated [its] leadership committees with younger members, and [its] partnership ha[d] grown steadily younger as a result of [the Firm's] lateral recruitment strategy." (Id. ¶ 172) Aware that the Firm had older attorneys in leadership positions, Shechtman believed that if it did not add "younger people . . . the firm wouldn't survive." (Id. ¶ 173)

From the time Shechtman became Pryor's Managing Partner, he began advocating for Laufer's dismissal even though he admitted that "didn't have a basis to judge" Laufer's "legal abilities." (Id. ¶¶ 175-76)  He did, however, know that Laufer was hired at an unusually old age. (Id. ¶ 174)

Shechtman also blocked Laufer's professional progression.  In 2008, Shechtman denied Laufer's promotion request.  Woldenberg told Shechtman that Laufer had requested a promotion. Woldenberg did not say that he opposed Laufer's request.  Nonetheless, Shechtman immediately told Woldenberg that Laufer's promotion was "more than unlikely."  (Id. ¶ 177)   In 2013, Woldenberg again relayed Laufer's promotion request to Shechtman.  Again, Woldenberg did not oppose the request.  And, once again, Shechtman denied the request.  (Id. ¶ 178) No associate had ever been put up for partner over Shechtman's objection.  (Id. ¶ 170)

Laufer was also not given access to the Firm's marketing department, including

opportunities to write or speak at industry events.  (Id. ¶ 179)  Richard Kay promoted Laufer's eventual replacement, David Spacht, but not Laufer.  For example, Kay arranged speaking opportunities for Spacht and invited Spacht and "younger partners" to industry events but did not do so for Laufer.  (Id. ¶¶ 180-81)  When Laufer secured his own speaking engagements, Kay was not supportive, instead demanding to know how many days Laufer would be out of the office.  (Id. ¶ 182)

Kay was also reluctant to have Laufer, the oldest associate at Pryor, appear before clients. (Id. ¶ 183)  Woldenberg also did not want to put Laufer in front of clients.  (Id. ¶ 184)  However, Kay had no problem with Laufer communicating with clients and providing them legal advice by email or telephone.  (Id. ¶ 183)

### Pryor Replaces Laufer with a Substantially Younger Associate

Pryor made the decision to fire Laufer in or around December 2014.  (Id. ¶ 185)  On June 25, 2015, Pryor offered Spacht an associate position and on June 29, 2015, Spacht accepted Pryor's offer.  (Id. ¶¶ 186-87)  Pryor hired Spacht as Laufer's replacement and decided to keep Spacht's hire "confidential" until it could first fire Laufer.  (Id. ¶¶ 188-89)  Spacht was 30 years old. (Id. ¶ 202), had substantially fewer years of experience than Laufer, and was neither a CPA nor a litigator. (Id. ¶ 203-05)

After deciding to fire Laufer and finding his younger replacement, Kay took the unprecedented step of going to Human Resources to file a complaint about Laufer, which the Firm then documented in Laufer's personnel file.  (Id. ¶¶ 190-92)  Not only was Kay's complaint stale (the events he mentioned took place approximately a year earlier), it was false.  (Id. ¶¶ 194-95)  Kay complained that Laufer was "not willing" and "would not" check his email on weekends.  (Id. ¶ 194)  Kay admitted that Laufer said no such thing.  (Id. ¶ 195)  Rather, Kay's intention was to

create a paper trail in anticipation of Laufer's dismissal.  (Id. ¶ 192)

On July 28, 2015, Pryor terminated Laufer's employment.  (Id. ¶ 197)  Laufer was 61 years old.  (Id. ¶ 201)  Kay told Laufer that the Firm was going in a "different direction," that Laufer's dismissal had nothing to do with Laufer's performance, and that the Firm "appreciated Laufer's long and dedicated service."  (Id. ¶ 198)  Before his dismissal, no one at the Firm told Laufer that his performance was deficient or that his job was in jeopardy.  (Id. ¶ 199)  Indeed, upon learning of Laufer's dismissal, a client sent an email to Kay praising Laufer and telling Kay that he was "sad" that Laufer was no longer with the Firm.  (Id. ¶ 200)

Unlike Laufer, Spacht was "on track" and assigned his proper class year.  (Id. ¶ 207)  Also in contrast to Laufer, Pryor viewed Spacht as someone who would potentially become a partner at the Firm.  (Id. ¶ 208)  Kay began to promote Spacht's speaking engagements.  (Id. ¶ 209)  Pryor paid Spacht a starting salary of $160,000 per year and, in less than two years, Spacht was making $200,000 per year - $10,000 more than Laufer.  (Id. ¶ 210-11)  At the time Pryor fired Laufer and replaced him with Spacht, Pryor had only four other associates age 40 or older.  Only one remains with the Firm.  (Id. ¶ 212)

### Pryor's Pretextual Explanations for Firing Laufer

Laufer hired counsel and complained of age discrimination.  Following Laufer's complaint, Pryor attempted to find a justification for Laufer's dismissal by, among other things, seeking out other Pryor employees to lodge complaints about Laufer.  (Id. ¶ 215)

For example, Phillip Hoffman, a current Pryor partner, executed a declaration attacking Laufer personally and professionally.  (Id. ¶ 220)  However, neither Shechtman, Kay nor Woldenberg, the partners who decided to terminate Laufer's employment, testified about any complaints by Hoffman.  (Id. ¶ 218)  Nor did Hoffman tell Laufer that he was displeased with

Laufer's work.  (Id. ¶ 219)  Indeed, one of Hoffman's purported issues occurred in 2015, after Pryor decided to fire Laufer.  (Id. ¶ 221)

Similarly, Richard Betheil, a current Pryor partner, executed a declaration attacking Laufer for contacting ██████REDACTED██████ regarding a cemetery plot.  (Id. ¶ 224)  Yet neither Shechtman, Kay nor Woldenberg testified that Richard Betheil complained about Laufer.  (Id. ¶ 222)  Nor did Betheil tell Laufer that he had any such complaints.  (Id. ¶ 223)  In fact, Betheil had put Laufer in touch with cemetery personnel.  (Id. ¶ 225)  As with the various other complaints, Betheil admitted that he only advised Shechtman of this purported incident after Laufer's termination and, thus, Betheil's purported complaint could not have been a factor in Laufer's dismissal.  (Id. ¶ 226)

Barry Landsman, a current counsel at Pryor, executed a declaration attacking Laufer professionally and personally, describing Laufer as "ill-tempered" and "unpleasant," and claiming that Laufer's work was deficient on numerous matters and that he had numerous conversations with Kay about Laufer.  (Id. ¶ 235)  However, neither Kay nor Woldenberg testified that Barry Landsman complained about Laufer and, moreover, Laufer never worked with Landsman.  (Id. ¶¶ 233-34)

Steve Rabinowitz, another partner, described Laufer as "terrible" and "curmudgeonly." (Id. ¶ 239)  Neither Kay nor Woldenberg testified that Rabinowitz complained about Laufer.  (Id. ¶ 236)  Nor did Rabinowitz complain to Laufer about his work.  (Id. ¶ 237)  However, after Shechtman notified the Firm about Laufer's lawsuit, Rabinowitz came to him to "commiserate" and "remind" Shechtman that he, too, had complaints about Laufer.  (Id. ¶ 238)

David Rose, another partner, also asserted a post-lawsuit complaint about Laufer's performance, even though Kay never received any feedback from Rose about Laufer's

performance.  (Id. ¶ 240) Nor did Kay consider Rose's opinion about Laufer in the decision to fire

Laufer.  (Id. ¶ 241) Indeed, Laufer had a pleasant working relationship with Rose, never heard any

complaints from Rose, and even assisted Rose on litigated estate matters.  (Id. ¶ 242) Shechtman,

too, did not recall any complaints by Rose.  (Id. ¶ 243) Again, it was only after Laufer sued Pryor

that Rose took it upon himself to "remind" Shechtman of his purported issues with Laufer.  (Id.

¶ 244)

 Finally, Shechtman executed a declaration claiming that Tracy Landauer, another Pryor

counsel, left the Firm, in part, because of Laufer.  (Id. ¶ 247) Nowhere in her deposition testimony

did Landauer claim she left Pryor because of Laufer.  (Id. ¶ 246) Instead, Landauer testified that

she decided to leave Pryor because she did not believe the firm would provide adequate support,

she wanted to work in New Jersey, and she was ready to create her own practice.  (Id. ¶ 245)

ARGUMENT

I.   THE SUMMARY JUDGMENT STANDARD

 "Summary judgment is inappropriate when the admissible materials in the record make it

arguable that the claim has merit."  Redd v. N.Y. Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012)

(quotation marks omitted); see Delville v. Firmenich Inc., 920 F. Supp. 2d 446, 457 (S.D.N.Y.

2013) ("A motion for summary judgment prevails '[o]nly when no reasonable trier of fact could

find in favor of the nonmoving party.'") (quoting White v. ABCO Eng'g Corp., 221 F.3d 293, 300

(2d Cir. 2000)). In deciding the motion, a court must "resolve all ambiguities, and credit all rational

factual inferences, in favor of the plaintiff."  Back v. Hastings on Hudson Union Free Sch. Dist.,

365 F.3d 107, 122 (2d Cir. 2004).

 The Second Circuit has "long recognized 'the need for caution about granting summary

judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to

the employer's intent.'" Walsh v. New York City Housing Auth., 828 F.3d 70, 74 (2d Cir. 2016)

(quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010)). Indeed, '"where

subjective issues regarding a litigant's state of mind . . . are squarely implicated, summary judgment

would appear to be inappropriate and a trial indispensible.'" Rodriguez v. Vill. Green Realty, Inc.,

788 F.3d 31, 49 (2d Cir. 2015) (quoting Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir. 1984)); see

id. ('"[A] sojourn into an adherent's mind-set will inevitably trigger myriad factual inferences, as

to which reasonable persons might differ in their resolution. Traditionally, this function has been

entrusted to the jury.'") (quoting Patrick, 745 F.2d at 159).

　　　　Finally, a court may not give credence to the moving party's evidence unless it comes from

disinterested witnesses and is neither contradicted nor impeached. Reeves v. Sanderson Plumbing

Prod., Inc., 530 U.S. 133, 151 (2000); see In re Dana Corp., 574 F.3d 129, 152-53 (2d Cir. 2009)

(reversible error to rely on testimony of interested witness for summary judgment). Conversely,

while "summary judgment is proper where there is nothing in the record to support plaintiff's

allegations other than the plaintiff's own contradictory and incomplete testimony, district courts

should not engage in searching, skeptical analyses of parties' testimony in opposition to summary

judgment." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014)

(internal citations and quotation marks omitted); see Danzer v. Norden Sys., Inc., 151 F.3d 50, 57

(2d Cir. 1998) ("Since the defendant will rarely admit to having said or done what is alleged, and

since third-party witnesses are by no means always available, the issue frequently becomes one of

assessing the credibility of the parties.").

II.　　AGE DISCRIMINATION

　　　　Federal and local laws prohibit age discrimination. 29 U.S.C. § 623(a) (the "ADEA"); New

York State Human Rights Law, N.Y. Exec. Law § 290; N.Y.C. Admin. Code § 8-107 (the "City

Law"). An employer violates federal and state laws where the employee's age was the "but for" cause of the employee's dismissal. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009).[2] "'[B]ut-for' causation does not require proof that [discrimination] was the only cause of the employer's action, but only that the [dismissal] would not have occurred in the absence of the [discriminatory] motive." Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 846 (2d Cir. 2013). There can be "multiple 'but-for' causes, each one of which may be sufficient to support liability." Id. at 846 n.5.

Under the City Law, the employee's age need not be the "but for" cause or even a significant factor in the decision to fire him. The employer is liable where it merely treated the employee "less well, at least in part for a discriminatory reason." Mihalik v. Credit Agricole Cheuvreux, N.A., Inc., 715 F.3d 102, 110 (2d Cir. 2013). In other words, because "discrimination shall play no role in decisions relating to employment," even "partial discrimination" (i.e., where the employer has "multiple or mixed motives for [its] action") is prohibited. Bennett v. Health Mgmt. Sys., Inc., 936 N.Y.S.2d 112, 120 (N.Y. App. Div. 2011) (emphasis added) (quotation marks omitted).

Significantly, not everyone involved in the termination decision must have acted for discriminatory reasons. Rather, the "impermissible bias of a single individual at any stage of the [dismissal] process may taint the ultimate employment decision . . . even absent illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the . . . process." Back, 365 F.3d at 125-26 (quotation marks omitted).

Under all of the applicable statutes, a court must consider the evidence as a whole. "No one

---

[2] "Age discrimination claims brought under the New York State Human Rights Law . . . are governed by the same standards as those brought under the ADEA." Wanamaker v. Columbian Rope Co., 108 F.3d 462, 467 (2d Cir. 1997)

piece of evidence need be sufficient, standing alone, to permit a rational finder of fact to infer that defendant's employment decision was more likely than not motivated in part by discrimination. To use the apt metaphor coined by Vincent Gambini . . ., a plaintiff may satisfy her burden by building a wall out of individual evidentiary bricks." Walsh, 828 F.3d at 76 (citing MY COUSIN VINNY (Twentieth Century Fox Home Entertainment 1992)). Moreover, "[s]ince it is rare indeed to find in an employer's records proof that a personnel decision was made for a discriminatory reason, whatever other relevant depositions, affidavits and materials are before the district court must be carefully scrutinized for circumstantial evidence that could support an inference of discrimination." Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996).

   A.   Replacement by Younger, Less-Qualified Employee

   "Generally, a plaintiff's replacement by a significantly younger person is evidence of age discrimination." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000). Here, there is no real dispute that Laufer was replaced by the much younger Spacht. Pryor witnesses admitted that Spacht replaced Laufer. (Pl. 56.1 ¶¶188) Moreover, Pryor kept the fact of Spacht's hire confidential until Laufer was fired. (Id. ¶ 189)

   Moreover, Spacht had substantially fewer years of experience compared to Laufer and unlike Laufer, Spacht was not a CPA and did not have litigation experience. (Id. ¶¶ 203-05) Replacing an older, more experienced worker with a younger, less qualified worker supports an inference of discrimination. See Colandrea v. Hunter-Tannersville Cent. Sch. Dist., No. 1:15 Civ. 0456 (LEK)(ATB), 2017 WL 1082439, at *6 (N.D.N.Y. Mar. 22, 2017) (inference of discrimination where oldest employee replaced by younger, less qualified employee); Irizarry v. United Parcel Serv., Inc., No. 3:11 Civ. 01658 (JCH), 2014 WL 1246684, at *14 (D. Conn. Mar. 24, 2014) ("The lesser qualifications of [employee's] younger replacement further support an

inference of discrimination.").[4]

B. Discriminatory Comments

Congress enacted the ADEA to battle "inaccurate and stigmatizing stereotypes" about older

workers' "productivity and competence." Hazen Paper Co. v. Biggins, 507 US 604, 610 (1993).

Naturally, then, comments by managers reinforcing negative stereotypes can be critical in ferreting

out age discrimination. "The relevance of discrimination-related remarks does not depend on their

offensiveness, but rather on their tendency to show that the decision-maker was motivated by

assumptions or attitudes relating to the protected class." Tomassi v. Insignia Fin. Grp., Inc.,478

F.3d 111, 116 (2d Cir. 2007) abrogated on other grounds by Gross, 557 U.S. at 167. "The more a

remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly

discriminatory behavior, the more probative that remark will be." Id. at 115. Importantly, a plaintiff

"need not show that [the decision-maker] declared that the [dismissal] decision was tied to the

[employee's age]. . . . Statements showing an employer's . . . bias" are sufficient. Tolbert v. Smith,

790 F.3d 427, 438 (2d Cir. 2015).

Here, Pryor's witnesses made numerous comments disparaging Laufer in age-specific

ways. They described him as "curmudgeonly," "stubborn," and "inflexible." (Pl. 56.1 ¶¶ 63, 96,

239) These comments are particularly relevant because they expose Pryor's stereotypical (and, in

this case, erroneous) view that older employees such as Laufer are unable to adapt. Courts have

routinely found such comments and views to be evidence of age discrimination. See O'Reilly v.

Marina Dodge, Inc., 435 F. App'x 8, 12 (2d Cir. 2011) ("[a] common stereotype of elderly people

---

[4] Contrary to Pryor's argument (Def. Brf. 18), this is not a case where the only proof of age discrimination is replacement by a younger worker. Here, as explained below, there is also proof of ageist remarks, a stated preference for advancing younger attorneys, false and misleading explanations for firing Laufer (including a false representation that Spacht did not replace Laufer) and disparate treatment.

is that they resist change and new approaches"); Winitt v. N.Y. State Div. of Human Rights, 377

N.Y.S.2d 60, 61 (N.Y. App. Div. 1975) ("you can't teach an old dog new tricks"); Herbert v. Nat'l

Amusement, Inc., 833 F. Supp. 2d 192, 199 (D. Conn. 2011) (comment that employee could no

longer do things the "old way" were "closely related to the alleged discriminatory behavior – that

of terminating [the employee] and replacing him with a much younger individual who would

presumably do things in the desired 'new ways'"); see also Machinchick v. PB Power, Inc., 398

F.3d 345, 353 (5th Cir. 2005) (comments that plaintiff had a "[l]ow motivation to adapt," was

"unwilling" to adapt to change, and was "inflexible" were age stereotypical remarks that can

support an inference of age discrimination); Peterson v. Mid-State Grp., Inc., 54 F. Supp. 3d 1039,

1044 (E.D. Wis. 2014) (evidence that employee's termination was motivated by "common ageist

stereotypes" such as that older workers are "unable or unwilling to learn or adapt to new

technology" supports inference of discrimination); Dayton v. Modesto Irrigation Dist., No. CV-F-

06-1070 (LJO), 20078 WL 4107904, at *5 (E.D. Cal. Nov. 16, 2007) (collecting cases and finding

comment "the older guys were stuck in their ways and didn't get as much work done" to be direct

evidence of age discrimination).  In other words, these comments "could reasonably be construed

. . . as explaining why [the decision to fire Laufer] was taken." Tomassi, 478 F.3d at 116.[5]

Tellingly, Pryor painted Laufer as being resistant to change even when he raised legitimate

issues. For example, Laufer opposed the use of computer generated forms that he believed were

too complex for clients to understand.  (Pl. 56.1 ¶ 78) Kay agreed.  (Id.) Even Laufer's colleague

who proposed the forms conceded that Laufer's position was "reasonable." (Id.)  Nonetheless,

---

[5] Pryor also painted **REDACTED** the 60-plus year old former head of finance, as someone who did not have the "disposition" or "desire" to handle complex software. (Pl. 56.1 ¶¶ 267-68) In other words, Pryor could not simply explain that **REDACTED** did not know how to use the software; rather, in Pryor's view, there was something about **REDACTED** that rendered him unfit for the job.  A jury could find that Pryor's opinion of **REDACTED** was ageist.

Pryor viewed Laufer as stubborn and unwilling to change.  (Id. ¶ 78) In another matter, Laufer

recommended that the Firm not release contested escrow funds without first obtaining a judicial

accounting. (Id. ¶ 103) Kay eventually agreed with Laufer,[6] and the matter was resolved quickly

and efficiently in court.  (Id. ¶ 103) Rather than praising Laufer for his legal abilities, Pryor has

presented this as another example of Laufer's "stubbornness."  (Id.)

Pryor's view about older employees such as Laufer stand in stark contrast to how the Firm,

in particular Shechtman, viewed younger attorneys.  Shechtman wanted to advance younger

attorneys.  (Id. ¶ 171)  He boasted that "[o]ver the years, [Pryor] ha[d] consistently populated [its]

leadership committees with younger members, and [its] partnership ha[d] grown steadily younger

as a result of [the Firm's] lateral recruitment strategy." (Id. ¶ 172)  Aware that the Firm had older

attorneys in leadership positions, Shechtman believed that if it did not add "younger people . . . the

firm wouldn't survive." (Id. ¶ 173)  Kay echoed Shechtman's views, remarking on the "younger

partners" that the Firm invited to industry events. (Id. ¶ 181)

Such comments are further evidence that the Firm engaged in age discrimination. See

Danzer, 151 F.3d at 53, 55-57 & n.6 (company "need[ed] new blood-new and younger, fresher

skills from out of schools"); Delville, 920 F. Supp. 2d at 460 (company wanted "younger blood")

(citing Kirsch v. Fleet St., Ltd., 148 F.3d 149, 163 (2d Cir.1998)); Hird-Moorhouse v. Belgian

Mission to U.N., No. 03 Civ. 9688, 2010 WL 3910742, at *1-2, 6 (S.D.N.Y. Oct. 5, 2010)

(supervisor "like[d] to have young faces around" and wanted a "younger image"); Shah v. James

P. Purcell Assocs., Inc., No. 3:05CV00306(PCD), 2007 WL 1630311, at *5 (D. Conn. Jun. 4,

2007) (employer wanted "up-and-comers"); Knutson v. Brounstein, No. 99 CIV 6094, 2001 WL

---

[6] Kay initially objected to Laufer's advice but not could not explain why Laufer's approach was wrong.  (Pl. 56.1 ¶ 103)

1661929, at *1, *4 (S.D.N.Y. Dec. 27, 2001) (comments that the department should start hiring younger people supported inference of age discrimination).

C.   Pretext

Pretext can also "constitute powerful evidence of discrimination." Stratton v. Dep't for the Aging for the City of N.Y., 132 F.3d 869, 879 (2d Cir. 1997) (quotation marks omitted). Thus, an employee can prove age discrimination "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non[-discriminatory] reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." Zann Kwan, 737 F.3d at 846; see Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 78 (2d Cir. 2001) (To show pretext for discrimination, a "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." (citations omitted) (internal quotation marks omitted)).

"The Second Circuit has 'reject[ed] any categorical rule requiring age discrimination plaintiffs to offer, in addition to their prima facie case and evidence of pretext, further evidence that age discrimination was the actual motivation in order to satisfy their burden." Delville, 920 F. Supp. 2d at 462 (quoting Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 469 (2d Cir. 2001)); see Kirkland v. Cablevision Sys., 760 F.3d 223, 227 (2d Cir. 2014) (reversing grant of summary judgment based solely on evidence of pretext). Indeed, under the City Law, a court "must" deny summary judgment "[i]f the plaintiff responds with some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete." Bennett, 936 N.Y.S.2d at 124; see Brown v. Crowdtwist, No. 12cv6110 (HB), 2014 WL 1468145, at *5 (S.D.N.Y. Apr.

15, 2014) ("Under the NYCHRL, when a plaintiff makes a reasonable showing that one of his employer's explanations is false or misleading, he is generally entitled to have a jury consider whether this false explanation is evidence of consciousness of guilt or a discriminatory motive.").

Here, the Firm fired Laufer and then tried to find a legitimate reason for doing so.  For instance, long after the decision to fire Laufer had been made, Kay took the unprecedented step of filing a complaint with Human Resources accusing Laufer of refusing to check his emails on the weekend. (Pl. 56.1 ¶ 189-93) Kay admitted that his complaint was not only old (it occurred in 2014, the year before Laufer's dismissal) but also false.  (Id. ¶ 193)  Kay testified that Laufer did not say that he was unwilling to check his email on weekends.  (Id. ¶ 194)  Nonetheless, that is what he told Human Resources. (Id. ¶ 193) Kay's purpose, of course, was not to discipline Laufer or document a legitimate performance issue.  Rather, Kay admitted that he wanted to create a paper trial before terminating Laufer's employment.  (Id. ¶ 191)  A jury could find that this was an attempt to cover up the Firm's discriminatory dismissal. See Chertkova, 92 F.3d at 93 (factfinder could determine that employer "was creating a record aimed at rationalizing plaintiff's termination"); Dupree v. UHAB-Sterling St. Hous. Dev. Fund Corp., No. 10-CV-1894, 2012 WL 3288234, at *10 (E.D.N.Y. Aug. 10, 2012) ("But a jury, not a judge, should decide whether that was the motive leading to the creation of a paper trail, or whether that paper trail was intended to establish a pretext for discrimination.").

Pryor also tried to hide the undisputed fact that it replaced Laufer with the much younger Spacht.  In its Answer to this lawsuit, Pryor flatly denied Laufer's allegation that he was "replaced days [after his dismissal] by an associate in his early thirties." (Answer, dated December 30, 2016 [dkt. 12], ¶ 2)  In fact, Pryor's own witnesses testified that Spacht replaced Laufer, an internal email describes Spacht as Laufer's replacement, and Pryor plotted to keep Spacht's hiring

"confidential" until Laufer was fired.  (Id. ¶ 189) A jury could easily infer from Pryor's false and misleading explanations that it engaged in this subterfuge to hide evidence of its discriminatory intent.  See Reeves, 530 U.S. at 147 ("the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt") (quotation marks omitted); Bennett, 936 N.Y.S.2d at 122 ("'[R]esort to [such] pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct.") (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1069 (3d Cir. 1996)).

   But that is not all.  Pryor has loaded the record with declarations from various Pryor partners attacking Laufer both professionally and personally.  Not only are the complaints untrue[7] but they could not have caused Laufer's dismissal since Pryor's three decision makers (Shechtman, Kay and Woldenberg) were virtually unaware of, or did not consider, many of these alleged complaints at the time they decided to fire Laufer.  In particular:

- Shechtman did not receive any complaints from Hoffman or Betheil, was unaware of any complaints by Rose or Locker when firing Laufer  (Pl. 56.1 ¶¶ 216, 218, 222, 243), and did not speak to Lundell about Laufer's performance  (Id. ¶ 231);[8]

- Kay was unaware of any complaints by Rabinowitz, Hoffman, Betheil, Lundell or Landsman (Id. ¶¶ 218, 222, 227, 233, 236), admitted that he did not receive any feedback from Rose about Laufer's performance (Id. ¶ 240), and did not consider

---

[7] None of these complaints were made to Laufer (Pl. 56.1 ¶¶ 219, 223, 229, 234, 237, 242, 246), and, with the exception of Kay's false email complaint in the days preceding Laufer's dismissal (Id. ¶¶ 190-95), none were documented in Laufer's personnel file.

[8] Indeed, Lundell admits that she was neither responsible for reviewing Laufer's performance nor asked for her input. (Pl. 56.1 ¶ 230)

the opinions of Rose, Locker or Landauer[9] when deciding to fire Laufer (Id. ¶¶ 74, 79, 241); and

- Woldenberg was unaware of any complaints by Rabinowitz, Hoffman, Betheil or Landsman (Id. ¶¶ 218, 222, 233, 236), and could not recall any complaints by Lundell even though he discussed Laufer's performance with her.  (Id. ¶ 228)

Shechtman's contention that he was "reminded" of certain complaints after Laufer was fired and sued (Id. ¶ 217) hardly helps Pryor's position.[10]  Nor does it help Pryor's cause that some of the performance problems it relies on to justify Laufer's dismissal occurred in 2015 - after Pryor already made the decision to fire Laufer.  (Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Def. Br.") 9)  Rather, these admissions could lead a jury to find that Pryor drummed-up complaints in order to cover up its discriminatory decision to fire Laufer. See DeMarco v. Holy Cross High Sch., 4 F.3d 166, 171 (2d Cir. 1993) ("The pretext inquiry . . . normally focuses upon factual questions such as whether . . . the putative non-discriminatory purpose was stated only after the allegation of discrimination.").[11]

Even the decision-makers' own criticisms of Laufer's performance are contradicted by Pryor's own witnesses and documents. See Gupta v. Al Jazeera Am., LLC, No. 16-CV-2980 (VEC), 2018 WL 1605571, at *14 (S.D.N.Y. Mar. 29, 2018) (finding that "the gaps and contradictions in [d]efendants' explanations [for discriminatory actions] allow a reasonable juror

---

[9] Contrary to Pryor's accusations, Landauer never claimed that Laufer was "often unresponsive." (Pl. 56.1 ¶ 79) Rather, Landauer testified about a single incident where she believed Laufer left the office without giving her notice. (Id.) Moreover, Woldenberg could not recall "any specifics" about what Landauer said about Laufer and never claimed that Landauer accused Laufer of being "dilatory in working on her assignments," as he now asserts in his declaration. (Id.)

[10] Indeed, Betheil admits that he first brought his complaint to Shechtman after Pryor fired Laufer. (Pl. 56.1 ¶ 226)

[11] Tellingly, it was during one of these discussions about Laufer's lawsuit that Rabinowitz – one of the purported complainers – described Laufer as "curmudgeonly." (Pl. 56.1 ¶ 239)

962304 v2                                     18

to infer that discrimination is 'the most likely alternative explanation'" (quoting <u>Zimmerman v. Assocs. First Capital Corp.</u>, 251 F.3d 376, 383 (2d Cir. 2001)).  For example,

- Shechtman admitted that he did not have a basis to judge Laufer's legal abilities, and could not recall a single complaint from a Doctors Council client about Laufer (Pl. 56.1 ¶¶ 26, 27, 29, 30, 33, 35);

- Woldenberg never told Laufer about any performance issues and twice conveyed Laufer's promotion request to Shechtman without expressing any opposition. (<u>Id.</u> 56.1 ¶ 39);[12]

- At his deposition, Kay did not claim that he and Laufer had loud arguments.  To the contrary, Kay testified that Laufer responded with "[s]ilence" and did not say anything in response to Kay's advice (<u>Id.</u> at ¶ 95);[13]

- Barbara Nocerini, the administrative assistant to Kay and Laufer who for many years sat outside their offices, could not recall any arguments between Kay and Laufer except for one time that Kay raised his voice towards Laufer (<u>Id.</u> 56.1 ¶ 95);

- According to Jeanne Matase, a Pryor counsel, Laufer spent, at most, only 20 minutes per week speaking to her.  (<u>Id.</u> at ¶ 101); and

- Laufer was not merely a scrivener.  Rather, he worked independently on complex,

---

[12] Woldenberg's criticism of Laufer's research is belied by his own testimony.  Woldenberg admitted that he did not recall speaking to Laufer about any inaccurate memoranda. (Pl. 56.1 ¶ 91) Nor could Woldenberg identify any specific inaccuracies even after reviewing the purportedly deficient document at his deposition. (<u>Id.</u> at ¶ 94)

[13] In a post-deposition declaration, Kay accuses Laufer of being "argumentative," "testy," engaging in "voluble and unpleasant arguments," having a "temper," being "unprofessional," expressing "great hostility" and being "abusive." (Kay Decl. ¶¶ 23-27) Nowhere in his deposition does Kay use any of those words. (Pl. 56.1 ¶ 95) Kay's changing narrative is further evidence of pretext.  Moreover, Pryor should not be permitted to obscure material factual disputes through declarations that contradict prior sworn testimony. <u>See</u> <u>Mack v. United States</u>, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").

litigated matters and often provided advice to other Pryor attorneys. (Id. ¶¶ 61, 71, 242)

Moreover, in a moment of candor, Kay told Laufer that he was not fired because of his performance but, rather, because the Firm was going in a "different direction." (Id. ¶ 198) A jury could certainly infer age discrimination from Kay's explanation. See Goodwine v. City of New York, No. 15-CV-2868 (JMF), 2016 WL 3017398, at *7 (S.D.N.Y. May 23, 2016) (Furman, J.) (finding that employee had stated plausible claims of discrimination where, inter alia, she was told that she would not "fit in").[14]

Pryor has undoubtedly made a strategic decision to throw as many accusations at Laufer as possible (even those that could not have been factors in the decision to fire Laufer) in the hopes that some will stick. Pryor is free to make that argument to jury. However, that is not the only reasonable inference to be drawn here. Rather, a reasonable jury could to find that Pryor's explanations are false, misleading or incomplete, Bennett, 936 N.Y.S.2d at 123, and thus pretextual.

D.  Comparative Evidence

It is well settled that "[t]he very essence of [a discrimination claim] is comparative evidence: Was the Plaintiff treated differently from persons not in [her] protected group?" Weinstock v. Columbia Univ., No. 95 Civ. 0569 (JFK), 1996 WL 658437, at *9 (S.D.N.Y. Nov. 13, 1996) (quotation marks omitted). Here, there are numerous ways in which Pryor treated Laufer worse than his younger associate counterparts:

---

[14] Pryor is well aware that firing an older worker because the employer is moving in a "different direction" is "code for illegal age discrimination," as it has eloquently argued in another matter. (Complaint ¶¶ 9-10, Buckley v. The National Football League, No. 18-cv-03309 (S.D.N.Y. Apr. 16, 2018).

- Pryor considered Laufer "off track," and thus paid him less than his younger peers merely because of his years of experience. It did not give him credit, much less consider, that his experience was directly relevant to his work at the Firm. (Id. ¶¶ 160-64); see Taggart v. Time, Inc., 924 F.2d 43, 47 (2d Cir. 1991) (treating an employee worse because he has "too much experience . . . is simply to employ a euphemism to mask the real reason for [the adverse action], namely, in the eyes of the employer the [plaintiff] is too old");

- It did not provide him with annual performance reviews, as it does with other associates. (Pl. 56.1 ¶¶ 165-66);

- Shechtman, who wanted to provide opportunities for younger associates (Id. ¶¶ 170-72), twice vetoed Laufer's promotion requests without considering the opinions of Laufer's managers (Id. ¶¶ 176-77) and despite the fact that Laufer was among the Firm's best associates at bringing in revenue. (Id. ¶¶ 148-54);

- The Firm wanted to keep Laufer in the background. Not because of Laufer's legal skills (he provided clients advice by email and telephone) but because the Firm did not want him to be seen. (Id. ¶¶ 182-83); and

- Pryor arranged for speaking opportunities and access to industry events to advance younger attorneys, including Laufer's younger replacement Spacht, but not Laufer. (Id.¶¶ 178-81)

Pryor argues that Laufer cannot prove discrimination because, conveniently, he has no similarly-situated comparators. (Def. Brf. 19-20) In Pryor's view, Laufer can only compare himself to other associates with the same "age and experience," within the same department and reporting to the same supervisors. (Id.) That, of course is not the law. The standard for comparison

is appropriately flexible.   It does not require identical job positions, but rather a "situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." McGuinness v Lincoln Hall, 263 F3d 49, 54 (2d Cir 2001); see Graham v Long Island R.R., 230 F3d 34, 40 (2d Cir 2000) ("[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances . . . rather than a showing that both cases are identical.")) Thus, the "employer's treatment of younger workers, even if they are not similarly situated, is relevant evidence of the employer's attitude about age." Gorzynski, 596 F.3d at 109, n.7.  Moreover, "the fact that other younger employees" were treated differently "is both prima facie evidence of discrimination . . . and evidence that the reasons given by [defendant] . . . were pretextual." Id. at 108.

Here, in addition to the above examples, the manner in which treated REDACTED one of Laufer's substantially younger fellow associates, is significant.  REDACTED was deemed not a good fit by the Firm. (Pl. 56.1 ¶¶ 250-51) However, Pryor did not fire REDACTED (Id.) Rather, it warned him about his performance issues, gave him a chance to improve and, when he did not, REDACTED and the Firm voluntarily agreed to part ways.  (Id.)  In contrast, Pryor fired Laufer without warning.  (Id. ¶ 199)see  Gorzynski, 596 F.3d at 99, 107-09 (airline employee fired for her "unprofessional conduct and poor interpersonal skills" could show age discrimination through evidence that "other younger employees were not disciplined for violating numerous policies," including smoking on the job, sleeping during work hours, opening passengers' bags, altering United Postal Service sheets and holding onto foreign currency that had been reported missing).[15]

---

[15] Pryor also did not fire two of Laufer's younger colleagues who, like Laufer, were considered to have low billable hours.  (Pl. 56.1 ¶¶ 260-61) The number of hours Laufer was able to bill was dependent on the work available in the department (Id. ¶ 256), which are typically lower in the trusts and estates department.

Finally, Pryor argues that it could not have discriminated against Laufer because (1) the decision-makers were older than Laufer and (2) the same person who hired Laufer (Kay) was involved in the decision to fire him.  (Def. Brf. 22-23) Both of these arguments fail.

First, it is well settled that people can discriminate against members of their own class. See Feingold v. New York, 366 F.3d 138, 155 (2d Cir. 2004) (rejecting district court's suggestion that no inference of discrimination could be drawn because plaintiff was fired by someone in the same group); Danzer, 151 F.3d at 55 ("The proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable."); see Rollins v. Fencers Club, Inc., 128 A.D.3d 401, 402 (N.Y. App. Div. 2015) ("Under these circumstances, the fact that several of the persons involved in the decision to fire plaintiff were close to her in age, and thereby in the same protected class, does not vitiate the inference of discriminatory animus raised by [defendant's] claimed remarks.").

Here, the inference of discrimination is especially pronounced because the evidence shows that Shechtman was concerned about the future of the Firm if it did not advance younger attorneys. (Pl. 56.1 ¶¶ 171-73); see Delville, 920 F. Supp. 2d at 460 (statements that indicated defendant's "preoccupation with the age of its employees," including concern about their "[a]ging top performers," could support an inference of age discrimination (alteration in original)).[17]

Second, the same actor inference is inappropriate in an age discrimination case "when a significant period of time elapses between the hiring and firing." Carlton, 202 F.3d at 138; see id. (seven years passing between hiring and firing "significantly weakens the same actor inference"); Thomas v. iStar Fin., Inc., 438 F. Supp. 2d 348, 361 (S.D.N.Y. 2006), aff'd, 629 F.3d 276 (2d Cir.

---

[17] That Pryor hired Laufer at age 43 is also not a basis to grant summary judgment. See O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996).

2010) ("In the Second Circuit, the [same actor] inference no longer applies when more than two years separate the hiring and firing."); see also Gorzynski, 596 F.3d at 96, 109 (reversing grant of summary judgment on age claim where plaintiff was hired at age 54 and fired just over two years later). Moreover, "even at the summary judgment stage of litigation, 'the same-actor inference is permissive, not mandatory, and even if the same individuals made both decisions, the Court would not be compelled to give [the defendant] the benefit of the inference.'" Benedith v. Malverne Union Free Sch. Dist., 38 F. Supp. 3d 286, 319 (E.D.N.Y. 2014)  (quoting Memnon v. Clifford Chance US, LLP, 667 F.Supp.2d 334, 351 (S.D.N.Y. 2009)).

## CONCLUSION

Ultimately, Pryor misunderstands the role of summary judgment. It erroneously believes that it can avoid a trial simply because it has articulated some nondiscriminatory basis for firing Laufer. That is not so. Indeed, it is the rare employer that cannot clear this especially low bar.  To avoid a trial Pryor must instead show its version of the facts is the only permissible one. This, Pryor has failed to do. For the reasons stated above, Laufer respectfully requests that this Court deny Pryor's motion for summary judgment.

Dated: New York, New York
           September 7, 2018

                                          VLADECK, RASKIN & CLARK, P.C.

                          By: _____
                                    Anne C. Vladeck
                                    Valdi Licul
                                    Joshua Tarrant-Windt
                                    Vladeck, Raskin & Clark, P.C.
                                    565 Fifth Avenue, 9th Floor
                                    New York, New York 10017
                                    212.403.7300
                                    Attorneys for Plaintiff

962304 v2                                    24