UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALAN S. LAUFER, | |
| Plaintiff, | 16-CV-8487 (JPO) |
| -v- | OPINION AND ORDER |
| PRYOR CASHMAN, LLP, | |
| Defendant. | |

J. PAUL OETKEN, District Judge:

After Defendant Pryor Cashman, LLP ("Pryor"), a law firm, terminated the employment

of Plaintiff Alan S. Laufer on July 28, 2015, Laufer filed this lawsuit, alleging that he was fired

because of his advanced age, in violation of the Age Discrimination in Employment Act of 1967

("ADEA"), 29 U.S.C. §§ 621–634; the New York State Human Rights Law ("NYSHRL"), N.Y.

Exec. Law § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C.

Admin. Code § 8-101 *et seq.*  Discovery in the case has now concluded, and Pryor has moved for

summary judgment.  (Dkt. No. 41.)  For the following reasons, the motion is denied.

I.      **Background**

        A.      **Factual Background**

        The Court draws its discussion of the facts from the statements filed by the parties

pursuant to Local Rule 56.1 in connection with this motion, and from the underlying summary

judgment record.  Unless otherwise noted, the following facts are undisputed.

                1.      **Laufer Is Hired at Pryor**

        In the first few years after Laufer's 1978 graduation from law school, he worked as a tax

specialist at an accounting firm.  (Dkt. No. 67-3 ("Laufer Tr.") at 5:16–18, 6:12–7:7, 8:23–25.)

Laufer, though, hoped to find work as a law firm associate, and in 1982, after a few unsuccessful

interviews, he secured a position at the office of a solo practitioner, Morris Friedman. (Laufer Tr. at 7:8–8:9, 9:6–17.) Laufer worked at this job until 1985 (Laufer Tr. at 9:20–24), at which point Friedman decided to "take a lesser role and take on a partner" (Laufer Tr. at 10:17–18). But Friedman "did not want to make [Laufer] a partner" (Laufer Tr. at 10:20–21), so Laufer and Friedman separated "by mutual agreement" (Laufer Tr. at 10:6), and Laufer hit the job market.

Laufer's next two positions were short-lived. First, Laufer worked for four to six months as an associate at a law office (Laufer Tr. at 11:12–12:14) but was terminated after his employer discovered that Laufer had been interviewing with another firm (Laufer Tr. at 14:11–15). Next, Laufer got a position at Carro Spanbock, a law firm, but was fired six to eight months later because the firm did not have enough work for Laufer to do. (Laufer Tr. at 13:24, 15:12–16:23.)

The difficulties of locking down a long-term prospect continued thereafter. In late 1985 or early 1986, Laufer started work at another law firm, only to be terminated around three years later (Laufer Tr. at 22:16–23:5), a course of events that Laufer attributes to the firm's practice, "with very few exceptions," of firing their associates after a few years (Laufer Tr. at 24:4–9). Some months later, Laufer took a job as an in-house attorney at an actuarial consulting firm, but once more the arrangement ended after a couple years, with the firm terminating Laufer in 1992 because it did not have enough work for him. (Laufer Tr. at 30:8–23, 31:24–32:18, 35:2–4.) Following that stint, Laufer spent about five years doing part-time assignments and performing legal and accounting services as a solo practitioner while continuing to seek more permanent employment. (Laufer Tr. at 36:14–16, 38:4–25; Dkt. No. 66 ("Laufer Decl.") ¶ 9.)

After five years of solo practice, Laufer found Pryor. In August 1997, Laufer was hired at the age of forty-three as a temporary attorney at Pryor by Richard Kay, who was sixty-one at that time and who, along with Eric Woldenberg, co-headed Pryor's Trusts and Estates Group.

(Dkt. No. 65 ("CSOF") ¶¶ 3, 6, 12–14, 21; *see also* Dkt. No. 43 ("Woldenberg Decl.") ¶¶ 4, 7.) And in June 1998, Kay—who, with Woldenberg, supervised Laufer during Laufer's time at Pryor—decided to make Laufer an associate. (CSOF ¶¶ 15, 21; Dkt. No. 44 ("Kay Decl.") ¶ 8.)

With Laufer's new title came a starting salary of $105,000 (CSOF ¶ 19), which, Kay has explained, represented a "relatively low salary compensation base" (Dkt. No. 67-1 ("Kay Tr.") at 103:2–4). Ordinarily, Pryor would have calculated a new associate's compensation based on the associate's year of graduation from law school. (Kay Tr. at 109:15–19; *see also* Dkt. No. 67-2 ("Shechtman Tr.") at 98:10–15.) But Kay decided not to follow this practice in Laufer's case because, Kay maintains, Laufer "did not fit into the class structure." (Kay Tr. at 101:10–11.) After all, Laufer—unlike any other Pryor associate before or since—had been practicing law for nearly two decades prior to joining the firm. (CSOF ¶¶ 16, 18.)

Laufer's background was not the only thing that put him in a unique position. For one thing, during his time at Pryor, he was the Trusts and Estates Group's only associate. (CSOF ¶ 20.) For another thing, he was—and would remain—the oldest associate anywhere at Pryor. (Laufer Tr. at 113:11–19; *see also* Dkt. No. 67-14.)

### 2. Laufer's Early Work

According to Kay, he knew early on that Laufer would not play a starring role at Pryor. (Kay Decl. ¶ 10.) Kay recalls thinking that Laufer "demonstrated insensitivity when interacting with clients" and was better suited to work such as drafting documents and doing research. (*Id.*) And Woldenberg adds that he found Laufer's written work, too, to be lacking. (Woldenberg Decl. ¶ 9.) For example, Woldenberg claims that Laufer would omit necessary provisions when drafting certain estate documents. (Woldenberg Decl. ¶¶ 10–12.) According to Laufer, though, Kay and Woldenberg never raised such concerns with him at the time. (Laufer Decl. ¶¶ 43, 47.)

One example in particular illustrates this disjunction between what Laufer's supervisors now claim to have thought of Laufer's early performance and what those supervisors conveyed to Laufer at the time. Soon after Laufer joined Pryor, he began working for Doctors Council, a physicians' union that was one of Pryor's major clients. (CSOF ¶¶ 22, 24.) As part of this work, Laufer often met with Doctors Council members, solo or with Kay. (CSOF ¶ 26.) Kay claims that Laufer conducted himself robotically at client meetings, displaying little empathy. (Kay Tr. at 146:12–24.) And Ronald Shechtman, the Pryor employee who had originated the firm's relationship with Doctors Council, also claims to have had concerns. (CSOF ¶ 23; Shechtman Tr. at 112:17–18.) While admitting that he had no "basis to judge" Laufer's legal work (Shechtman Tr. at 118:21), Shechtman recalls that he found Laufer "awkward, uncomfortable in social situations and inarticulate about . . . legal issues" (Shechtman Tr. at 113:4–7). As a result, Shechtman claims, he approached Kay and Woldenberg in 1998 or 1999 (Dkt. No. 42 ("Shechtman Decl.") ¶ 11) and secured Kay's promise to limit Laufer's personal interaction with Doctors Council clients (*id.*; *see also* Shechtman Tr. at 116:21–117:14; Kay Decl. ¶¶ 12–13).

Laufer, though, paints a different picture. According to him, neither Kay nor Shechtman ever raised any concerns about his performance on any Doctors Council matters. (Laufer Decl. ¶¶ 15–16.) Indeed, he goes on, Shechtman never observed any of his Doctors Council client meetings and never discussed any Doctors Council matters with him. (Laufer Decl. ¶ 18.) Further, Laufer maintains, his client interactions were never curtailed, nor was he ever told that they would be. (Laufer Decl. ¶ 19.) After all, Laufer received no complaints from Doctors Council clients (Laufer Decl. ¶ 17), and Shechtman cannot recall having received any complaints either (Shechtman Tr. at 119:11–23).

### 3.     Laufer's Situation Begins to Stagnate

After Laufer had been at Pryor for roughly a decade, it grew increasingly clear that he was not going to advance.  In spring 2008, Laufer requested that Woldenberg put him forward for promotion.  (CSOF ¶ 38; Laufer Tr. at 129:20–22.)  When the appropriate time arrived, Woldenberg presented Laufer's request to Shechtman, who had become Pryor's managing partner in 2007.  (CSOF ¶¶ 10, 41.)  Shechtman responded that Laufer's promotion was "[m]ore than unlikely" (Shechtman Tr. at 124:15; *see also* CSOF ¶ 42), and Woldenberg now maintains that he too did not believe Laufer should be promoted, although he admits that he viewed Laufer's abilities as "usually sufficient for the work he was assigned" (Woldenberg Decl. ¶ 16).  In the end, Woldenberg claims, Laufer's request was considered and unanimously rejected by Pryor's six-member Executive Committee.  (Woldenberg Decl. ¶ 17.)

Laufer sees these events differently.  Given Shechtman's testimony that no associate had ever been "put up for partner over [his] objection," Laufer doubts that the Executive Committee actually considered his promotion request.  (Shechtman Tr. at 66:23–67:2; *see also* CSOF ¶ 43.)  And Shechtman's disapproval was, Laufer believes, a foregone conclusion.  As all parties agree, ever since Shechtman stepped into the role of managing partner, he had repeatedly urged Kay and Woldenberg to fire Laufer.  (CSOF ¶ 45.)  But although Shechtman claims that his desire to oust Laufer was a response to Laufer's substandard performance (Shechtman Decl. ¶ 25), Laufer believes that Shechtman wanted to clear the way for "younger associates" (CSOF ¶ 45).  In support of this view, Laufer points to Shechtman's testimony that he viewed it as important to "populate[] [Pryor's] leadership committees with younger members" (Shechtman Tr. at 174:22–

23; *see also id.* at 174:21–175:18) and that it was his goal "[w]hen warranted" to "promote younger partners internally" (Shechtman Tr. at 177:7–9; *see also* CSOF ¶¶ 171–72).[1]

As the 2000s drew to a close, Shechtman was not the only thorn in Laufer's side. For example, Laufer claims that Kay, who had treated him with condescension from the outset, was only growing worse over time. (Laufer Tr. at 75:20–76:3.) Around this time, then, Laufer began complaining more and more to family and friends about his treatment at Pryor (Dkt. No. 51-2 at 38:18–22), and in 2008 he started to "put out feelers" for other jobs (Laufer Tr. at 79:14–20).

But then the recession hit. In response to the consequent downtick in business, Pryor decreased the salaries of all its associates, including Laufer, in July 2009. (CSOF ¶¶ 54–55.) While most associates had their prior salaries restored after a year, though, Shechtman ensured that Laufer's prior salary was not restored and, in 2011, proposed that Pryor's Compensation Committee freeze Laufer's salary. (CSOF ¶¶ 56–57, 59.) Kay contends that he agreed with Shechtman's proposal because he thought Laufer's then-current salary "was acceptable for the services that he was providing," which "generally satisf[ied] the needs of the Trusts & Estates department" but were otherwise undistinguished. (Kay Decl. ¶ 16; *see also* Kay Tr. at 124:4–10.) And Woldenberg, too, though "not directly involved with setting compensation for the associates" (Dkt. No. 67-5 ("Woldenberg Tr.") at 115:14–16), also claims to have agreed with the proposal (Woldenberg Decl. ¶ 18). As a consequence of the freeze, Laufer's salary barely budged from 2009 to the time he was ultimately terminated in 2015. (CSOF ¶¶ 54–55, 64.)

---

[1] Laufer renewed his request for a promotion in 2013. (CSOF ¶ 65.) Woldenberg relayed this request to Shechtman, who indicated that he viewed it no differently than he had viewed Laufer's 2008 request. (CSOF ¶¶ 66, 68.) According to Woldenberg, the request was ultimately rejected unanimously by the Executive Committee. (Woldenberg Decl. ¶ 20.) Here too, though, Laufer claims that his request never reached the Executive Committee because Shechtman's disapproval would have rendered it dead on arrival. (CSOF ¶ 69.)

### 4. Laufer's Situation Supposedly Reaches a Tipping Point

In Pryor's version of events, the firm's relationship with Laufer deteriorated rapidly over the course of the following years.

Starting in 2008, Pryor began to bring new partners into the Trusts and Estates Group. (CSOF ¶ 46.) And some of these new partners took a dim view of Laufer. Tracy Landauer, who joined in 2010, recalls complaining to Woldenberg about Laufer on about half a dozen occasions. (CSOF ¶ 48; Dkt. No. 67-6 at 43:5–13.) For example, she remembers telling Woldenberg about times Laufer provided unsatisfying answers to legal questions, Laufer's resistance to changes being made to certain form documents used in the Trusts and Estates Group, and an occasion on which Laufer left the office in the middle of a time-sensitive project without notifying her that he had stopped work. (Dkt. No. 67-6 at 43:14–44:10, 48:20–49:25.) And Shechtman reports that when Landauer left the firm in 2013, she told him that her decision to leave stemmed in part from a "lack of support and cooperation from Laufer." (Shechtman Decl. ¶ 25.) After Landauer's departure, Karin Lundell joined Pryor as a partner in the Private Client Group, which encompasses the Trusts and Estates Group. (CSOF ¶ 51; Dkt. No. 67-9 at 28:13–22.) In Shechtman's telling, Lundell, too, had difficulties with Laufer. Specifically, Shechtman claims that Lundell told him that she found Laufer "difficult to work with, not responsive," and "patronizing" in at least one client interaction. (Shechtman Tr. at 30:2–6.)

The partners at the Trusts and Estates Group were reportedly not alone in finding Laufer to be a suboptimal colleague. For example, David Rose, a partner who sometimes worked on trusts and estates litigation (Dkt. No. 45 ¶ 4), claims that he found Laufer "very inconclusive in his advice" (Dkt. No. 45 ¶ 7), that getting help from Laufer was like "pulling teeth" (Dkt. No. 45 ¶ 8), and that he conveyed his concerns to Kay and Shechtman "on multiple occasions" starting in the mid-2000s (Dkt. No. 45 ¶ 9; *see also id.* ¶ 5; Shechtman Tr. at 16:10–17). Susan Locker,

Pryor's executive director, maintains that she also complained about Laufer to Kay and Shechtman after Laufer had grown "extremely rude" and "extremely hostile" toward her in reaction to a decision she had made in 2011 about Laufer's accrued vacation time. (Dkt. No. 67-8 at 32:12–15; *see also id.* at 11:14–16, 30:21–32:11, 36:10–19; Shechtman Tr. at 22:9–24.) Litigation partner Steven Rabinowitz, too, recalls having complained to Shechtman about Laufer in 2014, after Laufer reportedly performed no work on a time-sensitive assignment for six weeks despite having led Rabinowitz to believe that progress was being made on the assignment. (Dkt. No. 48 ¶¶ 4–10; *see also* Shechtman at Tr. at 19:4–20:21.) Finally, Philip Hoffman, a senior litigation partner, claims that he approached Woldenberg in 2009 and 2015 to voice a concern that Laufer was billing too many hours for simple work, and he also claims that he often complained to Shechtman about Laufer's habit of holding noisy and combative phone calls in the office.[2] (Dkt. No. 49 ¶¶ 2, 5–6, 9.)

To top it all off, Laufer's direct supervisors, Kay and Woldenberg, claim to have grown increasingly frustrated with Laufer around 2013 or 2014. (Kay Decl. ¶ 22; Woldenberg Decl. ¶¶ 25, 29.) As for Woldenberg, he describes a series of three assignments that Laufer performed, supposedly incorrectly, in 2013 and 2014.[3] (Woldenberg Decl. ¶¶ 25–28.) In connection with one of these assignments, Woldenberg grew "livid and professionally embarrassed" because Laufer's alleged error had resulted in a Pryor client executing a legal document that was invalid

---

[2] To pour further fuel on the fire, real estate lawyer Barry Landsman reports that he often needed to ask Kay to "prod Laufer" to assist on projects (Dkt. No. 46 ¶ 5; *see also id.* ¶ 2), and Richard Betheil, a partner, has recounted an episode of unprofessionalism on Laufer's part, although Betheil acknowledges that he did not inform Shechtman about the episode until after Laufer had already been fired (Dkt. No. 50 ¶¶ 1–7).

[3] Kay has also identified a specific client matter in which he and Laufer disagreed about the proper approach, but Kay and Laufer dispute whether this disagreement took place before or after Pryor had already resolved to terminate Laufer. (CSOF ¶ 103.)

under the relevant law. (Woldenberg Decl. ¶ 26.) Woldenberg claims to have "confronted Laufer on a call and told him that this kind of mistake was intolerable." (*Id.*) Laufer acknowledges that Woldenberg had indeed gotten "upset" about the incident, although Laufer disputes where to place the blame. (CSOF ¶ 89.)

As for Kay, he describes Laufer as having been "stubborn, unwilling to listen to advice, inflexible," and "[d]isrespectful to a certain extent" (Kay Tr. at 131:9–14), and maintains that these qualities grew worse around 2014, triggering "voluble and unpleasant arguments" between the two of them (Kay Decl. ¶ 23). Coworkers with offices near Kay and Laufer's attest to having observed such arguments between 2009 and 2015 (Dkt. No. 46 ¶¶ 6, 8; Dkt. No. 47 ¶¶ 3, 6), and Laufer recalls that Kay would sometimes "inappropriately yell" at him (Laufer Tr. at 74:10–11). One source of frequent dispute, according to Kay, was Laufer's tendency to engage in lengthy personal phone calls at work (Kay Tr. at 168:21–169:12), but although Laufer recalls one time that Kay confronted him about making personal phone calls, he maintains that the confrontation occurred in late spring 2015 (Laufer Tr. at 124:10–125:3), only after Pryor had conclusively resolved to terminate him (*see* Kay Tr. at 167:11–17). Kay also claims to have admonished Laufer on multiple occasions about the amount of time Laufer spent in the office of a coworker, Jeanne Matase (Kay Tr. at 171:19–172:22), but Matase describes her chats with Laufer as having occurred only once or twice a week for five or ten minutes at a time (Dkt. No. 67-7 at 13:7–15).

Laufer challenges the picture presented by his former colleagues' unflattering testimony. For one thing, Laufer maintains, nobody at Pryor ever told him that his performance was deficient—not Kay, not Woldenberg, not Rose, not Landauer, not Hoffman, not Lundell, not Rabinowitz—and he never received a performance review—good, bad, or indifferent—during his entire time at the firm. (Laufer Decl. ¶¶ 20–21, 47–50, 66, 70, 73, 77.) Indeed, Laufer goes

on, many of the specific deficiencies he is now alleged to have exhibited were not once criticized prior to this litigation. This is true, Laufer claims, not only of his work on Doctors Council matters, but also of his personal phone calls, his purported overbilling, his spending time in Matase's office, and his work on some of the specific assignments Woldenberg has identified as supposedly faulty. (Laufer Decl. ¶¶ 15–16, 58, 66, 68, 86–87, 90.)

Moreover, Laufer attests that his work—which involved meeting solo with clients, giving legal advice, litigating matters without supervision, taking depositions as sole lead counsel, and doing significant legal research—pulled in substantial fees for Pryor. (Laufer Decl. ¶¶ 23–39.) Indeed, during the 2013–2015 period in which Laufer's performance was allegedly deteriorating, he ranked fifth among Pryor's sixty to seventy associates in terms of bringing in revenue (*see* Dkt. No. 67-22; Shechtman Tr. at 165:11–16, 166:8–11; CSOF ¶ 151), which Laufer takes to be representative of his track record of attracting clients throughout his time at Pryor (CSOF ¶¶ 152–53). And if one needs proof that Laufer's work was high quality, Laufer suggests, one need look no further than the fact that he was entrusted to perform legal services for his colleagues' relatives and to review documents that had been drafted by Landauer, a partner. (Laufer Decl. ¶¶ 12, 40.)

### 5. Laufer's Termination

By the end of 2014, Kay, Woldenberg, and Shechter were resolved to replace Laufer. (CSOF ¶ 108.) On June 29, 2015, Pryor took the first step toward doing so when it hired thirty-year-old David Spacht as a new associate in the Trusts and Estates Group. (CSOF ¶ 109; Kay Tr. at 178:25–179:9; Dkt. No. 67-14.) News of this hire, though, remained confidential at first, so as to allow Kay time to notify Laufer that he was being terminated. (Dkt. No. 67-29.) And Kay did so about a month later, on July 28, 2015, in a meeting with Laufer—who was then sixty-one—and Pryor's then-Manager of Human Resources, Oris Diaz. (CSOF ¶¶ 111–12; Dkt.

No. 67-11 ("Diaz Tr.") at 11:9–15, 68:7–18.)  Kay thanked Laufer for his years of service but

told him that "the firm was going in a different direction."  (Diaz Tr. at 68:15–17; *see also id.* at

68:22–24.)

Predictably, the individuals involved hold diverging views as to the reasons why Laufer

was terminated.  According to Woldenberg, Laufer's work had been "adequate for what [Pryor]

needed" at the time Laufer was hired (Woldenberg Tr. at 153:6–8), but by the end of Laufer's

tenure Pryor needed "someone with a more advanced and well-rounded skill set" to handle the

"more complex work" the firm was generating (Woldenberg Decl. ¶¶ 23–24).  Kay, for his part,

claims that the "great hostility" Laufer displayed toward him in 2014 left his "patience with

[Laufer's] behavior and shortcomings . . . exhausted."  (Kay Decl. ¶ 27.)  And Shechtman, as

noted, had wanted Laufer gone since 2007 (CSOF ¶ 45), although he claims that Laufer "became

increasingly self-destructive" during his final few years at the firm (Shechtman Decl. ¶ 25).

Laufer doubts that any of these reasons are genuine.  As discussed above, Laufer disputes

whether his colleagues were truly as disenchanted with him during the time of his employment

as they now claim to have been, and he disputes whether his performance actually changed in

any meaningful way in 2013 or 2014.  (*See, e.g.*, Laufer Decl. ¶¶ 24, 43–44, 47, 54.)  Moreover,

Kay has admitted that Landauer, Locker, and Rose's complaints about Laufer played no role in

the termination decision (Kay Tr. at 159:22–160:4), and Shechtman had forgotten about some of

these complaints until the present litigation (Shechtman Tr. at 17:15–18:9, 22:9–23:14).  Finally,

as for Woldenberg's claim that Pryor required attorneys with specialized skills because it was

moving into legal matters of greater complexity, Laufer maintains that his practice area had

actually grown "simpler[,] not more complex" during his time at the firm.  (Laufer Decl. ¶ 93.)

Moreover, Laufer maintains, Kay went so far as to take affirmative steps to manufacture a *post hoc* paper trail supporting the termination. On July 7, 2015, after Spacht had been hired at Pryor, but before Laufer had been fired, Kay went to Diaz in Human Resources to complain that Laufer was unwilling to check his email on the weekends. (Diaz Tr. at 81:3–86:6; *see also* Dkt. No. 67-30.) According to Kay, Laufer had said at one point in 2014, "I don't look at my e-mails over the weekend. If someone wants to reach me, they can call me on my phone or my cell phone or some other method, but I do not check my e-mails over the weekend."[4] (Kay Tr. at 180:6–10; *see also id.* at 179:22–24.) But although this alleged incident occurred in 2014, Kay did not tell Diaz about it for many months, and Kay has not denied that his reason for formally registering this belated complaint was to create "a paper trail documenting [his] reasons to fire Mr. Laufer." (Kay Tr. at 184:17–20; *see also id.* at 181:17–182:2.)

When this supposed pretext is stripped away, Laufer believes that his termination in fact appears to have been the culmination of a pattern of age discrimination that he had experienced while working at Pryor. (Laufer Decl. ¶ 59.) While Laufer was still working at the firm, he never voiced his belief that he was the target of such discrimination. (*Id.*; CSOF ¶ 114.) But after his termination, Laufer finally aired his suspicions by filing the instant suit.

### B. Procedural Background

On November 1, 2016, Laufer filed a three-count complaint against Pryor in this Court, alleging that his termination had been the product of age discrimination and seeking relief under the ADEA, NYSHRL, and NYCHRL. (Dkt. No. 1 ¶¶ 39–48.) Pryor answered the complaint on December 30, 2016 (Dkt. No. 12), and the case proceeded to discovery. On July 13, 2018,

---

[4] Laufer maintains that he never said this. (Laufer Decl. ¶ 61.)

following the close of discovery, Pryor moved for summary judgment. (Dkt. No. 41.) Pryor's motion has now been fully briefed (Dkt. Nos. 53, 62, 64), and the Court turns to its merits.

## II.        Legal Standard

Under Federal Rule of Civil Procedure 56, a court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material "if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)).

On a motion for summary judgment, "[i]t is the movant's burden to show that no genuine factual dispute exists." *Toussaint v. NY Dialysis Servs., Inc.*, 230 F. Supp. 3d 198, 210 (S.D.N.Y. 2017) (alteration in original) (quoting *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)). But "'when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim,' in which case 'the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.'" *Id.* (quoting *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013)).

In deciding whether the nonmovant's evidentiary proffer successfully establishes a genuine dispute of material fact, "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000). And because a court is foreclosed from "mak[ing] credibility determinations or weigh[ing] the evidence" at the summary judgment stage, *Reeves v. Sanderson*

*Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000), it must "disregard all evidence favorable to the moving party that the jury is not required to believe," *id.* at 151. Thus, in "a discrimination case where intent and state of mind are in dispute, summary judgment is ordinarily inappropriate," *Carlton*, 202 F.3d at 134, provided that the nonmovant has done more than "simply show that there is some metaphysical doubt as to the material facts," *Plotzker v. Kips Bay Anesthesia, P.C.*, 745 F. App'x 436, 437 (2d Cir. 2018) (summary order) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III. Discussion

Laufer presses claims under federal, state, and local antidiscrimination law. As for Laufer's federal and state claims, "[t]he elements of an age discrimination claim are essentially the same under the ADEA and the NYSHRL, and courts apply the same standards for analyzing age discrimination claims under both statutes." *Gonzalez v. Carestream Health, Inc.*, 520 F. App'x 8, 10 n.1 (2d Cir. 2013) (summary order). But Laufer's claims under the NYCHRL must be analyzed "separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). The Court first addresses Laufer's federal and state claims and then turns to his claim under the NYCHRL.

### A. ADEA and NYSHRL

Laufer's ADEA and NYSHRL claims are assessed under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See DiGirolamo v. MetLife Grp., Inc.*, 494 F. App'x 120, 122 (2d Cir. 2012) (summary order). Under this framework, "the plaintiff bears the initial burden of establishing a prima facie case of discrimination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010). If the plaintiff successfully carries this burden, "the burden shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason' for [the challenged employment] action." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at

802). If the defendant does so, then "the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's [action] was in fact the result of discrimination." *Id.* To prevail at this final step, the plaintiff must establish "'that age was the "but-for" cause of the challenged adverse employment action' and not just a contributing or motivating factor." *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)).

In keeping with this framework, the Court first asks whether Laufer has made out a *prima facie* case of discrimination. To do so, he must "show that he was (1) within the protected age group; (2) qualified for [his] position; (3) discharged; and (4) that such discharge occurred under circumstances giving rise to an inference of discrimination." *Carlton*, 202 F.3d at 134. Here, Pryor never disputes that Laufer has presented adequate evidence of the first three elements of his *prima facie* case. Instead, it argues only that Laufer "cannot show that his termination occurred under circumstances giving rise to an inference of discrimination." (Dkt. No. 53 at 17.)

The Court concludes that Laufer has carried the "minimal" burden of making out a *prima facie* case of age discrimination. *Faldetta v. Lockheed Martin Corp.*, No. 98 Civ. 2614, 2000 WL 1682759, at *6 (S.D.N.Y. Nov. 9, 2000). Laufer, Pryor's oldest associate by over a decade, was replaced with an attorney more than thirty years his junior. (Dkt. No. 67-14.) While "[t]he replacement of an older worker with a younger worker or workers does not itself *prove* unlawful discrimination," *Fagan v. N.Y. State Elec. & Gas Corp.*, 186 F.3d 127, 134 (2d Cir. 1999) (emphasis added), courts typically treat a plaintiff's replacement by a "*substantially* younger" person as "circumstances giving rise to an inference of discrimination" sufficient to satisfy the plaintiff's *prima facie* burden, *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (emphasis added); *see also, e.g.*, *Friedman v. Swiss Re Am. Holding Corp.*, 643 F. App'x 69, 71 (2d Cir. 2016) (summary order) (describing a plaintiff's showing that he was "replaced by a

younger, less qualified employee" as sufficient evidence of discrimination at the *prima facie* stage).  Laufer has thus met the "*de minimus* burden of establishing a prima facie case." *Faldetta*, 2000 WL 1682759, at *6; *see also Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000) (finding a plaintiff's replacement by a person thirty years his junior "sufficient to give rise to the inference that he was the victim of discrimination" for purposes of his *prima facie* case).

The Court accordingly turns to the next step of the *McDonnell Douglas* analysis and asks whether Pryor has proffered "some legitimate, nondiscriminatory reason" for terminating Laufer. *Gorzynski*, 596 F.3d at 106 (quoting *McDonnell Douglas*, 411 U.S. at 802).  This question, too, is easily answered.  Pryor devotes a large portion of its opening brief to reiterating the wealth of testimonial evidence about Laufer's shortcomings as an attorney and a coworker.  (Dkt. No. 53 at 12–17.)  And there can be no doubt that the type of poor performance, unreliability, and lack of collegiality that Laufer's former colleagues describe would constitute legitimate grounds for termination.  *See Johnson v. Schmid*, 750 F. App'x 12, 17 (2d Cir. 2018) (summary order) (identifying "poor performance" as a valid reason for terminating an employee who belongs to a protected class).  Indeed, Laufer never disputes that Pryor has carried its burden of presenting a nondiscriminatory basis for his termination.

The Court therefore turns to the final step in the analysis: whether Laufer has shown that the record evidence would permit a rational juror to conclude that his termination "was in fact the result of discrimination."  *Gorzynski*, 596 F.3d at 106.  Although the issue is close, the Court concludes that he has.  To be sure, Laufer has hardly presented an overwhelming case.  But when construed in the light most favorable to Laufer, the evidence offers a discriminatory narrative that a juror could reasonably believe, depending on her view of the witnesses' credibility.

That narrative might run as follows: Laufer, when hired, may have had his shortcomings, but he adequately carried out the functions for which he was brought on board. (*See, e.g.*, Kay Decl. ¶¶ 10, 16; Woldenberg Decl. ¶ 16; Woldenberg Tr. at 153:6–8.) Thus, although Pryor was reluctant after a time to continue notching up his compensation, Laufer continued to provide useful, if undistinguished, work for the firm. (*See, e.g.*, Kay Decl. ¶ 16; *see also* Kay Tr. at 124:4–10.) And this steady state of affairs continued for eighteen years, with Laufer seeing no real advancement, but at the same time receiving no real complaints either, and with the demands of his job undergoing little change. (*See, e.g.*, Laufer Decl. ¶¶ 24, 43–44, 47, 54, 93.) But in the midst of this relative stasis, one pertinent factor remained variable: Laufer's age.

As Laufer, Pryor's oldest associate by over a decade, pushed into his sixties, he became more and more noticeable as an outlier among a workforce made up of associates principally in their twenties and thirties. (Dkt. No. 67-14.) Influenced by ageist stereotypes, his coworkers began to view him as "stubborn" and "curmudgeonly" (Shechtman Tr. at 19:22–21:11, 58:4–8) despite his success in generating revenue for the firm (*see* Dkt. No. 67-22). And Shechtman, who saw it as his role to "develop[] always young leaders who can grow into leadership positions," viewed this state of affairs as a missed opportunity to cultivate young talent. (Shechtman Tr. at 175:13–14.) Accordingly, Shechtman convinced Kay and Woldenberg to replace Laufer with Spacht, a less experienced associate three decades Laufer's junior. (CSOF ¶ 45; Dkt. No. 67-14.) Once Spacht had stepped into Laufer's former role, Kay began to carry out Shechtman's aim of grooming young talent by inviting Spacht out to the sort of industry events that Pryor holds open to "associates, [and] typically younger partners" but that Kay had never made available to Laufer. (Kay Tr. at 57:12–16; *see also id.* at 56:22–58:22.)

Faced with this possible reading of the evidentiary record, Pryor responds that no reasonable juror could adopt it. In making this argument, Pryor emphasizes three main themes.

First, Pryor understandably places considerable emphasis on the harsh judgments of Laufer's former coworkers. (*See* Dkt. No. 53 at 12–17, 22.) The Court acknowledges that this testimony could certainly convince a reasonable juror that Pryor's motives for terminating Laufer were pure. But at the summary judgment stage, the Court must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151. And "a jury is free to believe or disbelieve any of the witnesses brought before it." *SEC v. Drucker*, No. 06 Civ. 1644, 2007 WL 2042493, at *5 (S.D.N.Y. July 13, 2007). In other words, a "case of 'he said, she said,'" typically calls for "a full trial on the merits," *Wentworth v. Hedson*, 248 F.R.D. 121, 123 (E.D.N.Y. 2008) (citation omitted), and the result is the same in a "he said, *they* said" scenario like this one.

If a jury did disbelieve Pryor's witnesses, nothing in the present record would make it unreasonable as a matter of law for that jury to reject Pryor's claim that Laufer's performance deteriorated to concerning levels in 2013 or 2014. Despite Laufer's eighteen-year tenure, the record contains no more than a handful of contemporaneous documents that memorialize any concerns about his performance. Beyond a few brief email chains (*e.g.*, Dkt. Nos. 51-9, 51-10), some of which postdate Pryor's decision to fire Laufer (Dkt. Nos. 51-14, 51-15), Pryor has turned up no damning intraoffice communications, no formal evaluations, no written complaints from coworkers, and no written comments on Laufer's work product. Nor is there conclusive evidence that any Pryor employee, including Laufer's direct supervisors, found anything about Laufer sufficiently concerning to justify communicating any criticisms to Laufer himself at any point during his eighteen-year tenure. (*See, e.g.*, Laufer Decl. ¶¶ 43, 49, 58.) Indeed, a jury

could easily find it suspicious that one of the few written critiques of Laufer—the complaint Kay made to Diaz (*see* Dkt. No. 67-30)—was lodged only after Pryor had already decided to fire Laufer and was based on a months-old incident that had apparently inspired no action at the time it occurred.

Pryor's second main theme in challenging the reasonableness of Laufer's narrative of events is the age diversity of its workforce. (*See* Dkt. No. 53 at 23.) According to Pryor, around 62% of its staff is over the age of forty. (Shechtman Decl. ¶ 37.) And, Pryor points out, Kay, Woldenberg, and Shechtman were all either older than or not much younger than Laufer at the time they fired him. (Dkt. No. 53 at 1–2.) But "[t]he proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 55 (2d Cir. 1998). And while the fact that Pryor has older workers on payroll may be probative of whether the decision to fire Laufer was made on the basis of discriminatory intent, it hardly clinches the matter. After all, whatever the demographics of Pryor's workforce as a general matter, it is undisputed that Pryor's *associates* are mainly in their twenties and thirties. (Dkt. No. 67-14.) The fact that Pryor was happy to retain older partners, in other words, is consistent with Laufer's theory that Shechtman wished to seed Pryor's associate ranks with younger employees.

Third and finally, Pryor notes that the person who chose to hire Laufer at an "unusual age for an Associate" (Shechtman Decl. ¶ 40), Kay, was among those who later chose to terminate him (Dkt. No. 53 at 22–23). This point, Pryor argues, cuts against an inference that the latter decision was the product of a discriminatory animus that presumably would have dissuaded Kay from hiring Laufer in the first place. Pryor is right that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an

invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).  But even if this "same actor" inference might in some cases be sufficient to eliminate any material dispute as to a decisionmaker's motives—and even if this Court were inclined to overlook the fact that people other than Kay were involved in the decision to terminate Laufer—"the inference is less compelling when a significant period of time elapses between the hiring and firing." *Carlton*, 202 F.3d at 138.  The Second Circuit has deemed a seven-year gap sufficient to undercut the "same actor" inference, *id.*, so that inference can hardly require a grant of summary judgment in the face of the eighteen-year gap here.

In the end, then, the Court is unable to conclude on the basis of the present record that no reasonable jury could rule in Laufer's favor, irrespective of the credibility determinations the jury might make at trial.  The Court reiterates that Pryor has raised strong defenses against Laufer's allegations of age discrimination, not the least of which is its formidable showing of testimonial evidence.  But it is for a jury, and not this Court, to determine whether those defenses will ultimately carry the day.

### B.    NYCHRL

The Second Circuit has recognized that the NYCHRL is to be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik*, 715 F.3d at 109 (quoting *Albunio v. City of N.Y.*, 16 N.Y.3d 472, 477–78 (2011)). Accordingly, "conduct [that] is not actionable under federal and state law" might nonetheless fall within the NYCHRL's remedial sweep.  *Id.*  Because the Court has concluded that Pryor is not entitled to summary judgment on Laufer's ADEA and NYSHRL claims here, Pryor *a fortiori* cannot demonstrate that it is entitled to summary judgment under the NYCHRL's more plaintiff-friendly standards.  *Cf. Taylor v. City of N.Y.*, 207 F. Supp. 3d 293, 304 (S.D.N.Y. 2016) ("[T]o

the extent that a plaintiff states a claim under [federal antidiscrimination law] and the NYSHRL, she . . . necessarily states a claim under the NYCHRL.").

## IV. Conclusion

For the foregoing reasons, Pryor's motion for summary judgment is DENIED.

Within three weeks of the date of this order, the parties shall confer and file a joint letter with proposed trial dates within the next six months.

The Clerk of Court is directed to close the motion at Docket Number 41.

SO ORDERED.

Dated: March 29, 2019
New York, New York

_____
J. PAUL OETKEN
United States District Judge